**E-FILED**
Friday, 29 December, 2006  02:12:11 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| KEVIN GROESCH, GREG SHAFFER and SCOTT ALLIN, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No.  04-3162 |
| CITY OF SPRINGFIELD, ILLINOIS, a municipal corporation, | ) ) ) ) | |
| Defendant. | ) ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendant City of Springfield, Illinois' (City) Motion for Summary Judgment (d/e 19).  The City moves for summary judgment on all claims set forth in the Complaint (d/e 1).  In Counts I, III, and V, Plaintiffs Kevin Groesch, Greg Shaffer, and Scott Allin respectively allege discriminatory treatment in employment based on their race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et seq</u>.  In Counts II, IV, and VI, Plaintiffs Groesch, Shaffer and Allin, respectively, claim a violation of 42 U.S.C. § 1983, based

on allegations that they were treated less favorably than a similarly situated African-American colleague in violation of their right to equal protection under the Fourteenth Amendment to the United States Constitution. The City now moves for summary judgment. For the reasons set forth below, the City's Motion for Summary Judgment is ALLOWED in part and DENIED in part.

<u>STATEMENT OF FACTS</u>

Plaintiffs Kevin Groesch, Greg Shaffer, and Scott Allin are patrol officers currently employed by the City's Police Department. Plaintiffs are all Caucasian males. Groesch's employment with the City began in June of 1981. Sometime in December 1988, Groesch made requests to take a six-month leave of absence and later a three-month leave of absence. Those requests were denied; Groesch was granted a sixty-day leave of absence, however. After the expiration of the leave, Groesch did not return to the City's employ, but left the City's employ in good standing, accepting a position at the Illinois Department of Corrections as an investigator. Groesch states in his Affidavit that, shortly following his resignation from the Police Department, he wished to return to the City's employ. In that effort, between 1989 and September of 1996, he submitted applications and

tested to be placed on an eligibility list created by the Police Department to hire new officers.[1] Plaintiffs' Appendix to the Memorandum in Opposition to Defendant's Motion for Summary Judgment (d/e 22), Attachment 1, Affidavit of Kevin Groesch (Groesch Aff.), ¶ 7.

On September 10, 1996, approximately 8 years later, Groesch returned to the City's employ as a patrol officer. When Groesch was rehired by the City, the City did not give him any credit for his previous years of service for purposes of calculating his seniority, vacation and sick pay

---

[1]Generally, when there is a need to hire police officers and sufficient funds are budgeted for that purpose, the City creates an eligibility roster and places names of the candidates who have successfully completed necessary testing on the roster. The City hires new recruits from the eligibility roster. The Springfield Civil Service Commission, not the Springfield City Council, is normally involved in the hiring process of police officers; as such, it is responsible for resolving issues regarding whether a police officer could be hired or whether a candidate met the requirements for a position.

In order to become a police patrol officer, a candidate must first submit his or her application to the City's Human Resources Department and then undergo a written examination, a physical agility test and an oral interview. At the completion of the testing process, the candidate is placed on an eligibility list created by the City and is ranked based on the test scores. When an eligibility roster is certified by the Civil Service Commission, it remains in place for three years. Plaintiffs' Appendix to the Memorandum in Opposition to Defendant's Motion for Summary Judgment, Attachment 6, Deposition of Gina Larkin (Larkin Dep.) 29. The City would send background questionnaires to top applicants on the eligibility list. Once the background questionnaire was returned, the Police Department conducted a background check of each candidate, with the results being sent to the Civil Service Commission. Candidates that survived background checks would then undergo a psychological examination. Candidates that successfully passed both the background check and the psychological examination would be extended a conditional offer of employment. Once a candidate is determined to be fit for duty based on a medical examination, an official offer of employment is extended. Following a successful completion of the requisite training, the candidates are then sworn in as police officers.

benefits.[2]  Groesch was considered a new hire, with his seniority being determined as if he had newly joined the Police Department.

Shaffer and Allin also have similar employment patterns.  Shaffer's employment with the City began in January 1980 as a police patrol officer. In July 1987, Shaffer left the City's employ in good standing to pursue other career opportunities.  At the time he left, Shaffer requested a leave of absence, but his request was denied.  On July 6, 1993, however, he returned to the City's employ as a patrol officer.  When Shaffer returned to the City's employ, he was considered a new hire and was not given any credit for his prior years of service for purposes of calculating his seniority, vacation and sick pay benefits.

Allin's employment with the City began on January 7, 1980 as a police patrol officer.  On November 22, 1986, he left the City's employ in good standing to form his own business.  At the time he left, Allin requested a leave of absence, but was denied.  Almost six months after he left the Police Department, Allin was interested in returning to the City's employ.

---

[2]At all times relevant to this suit, the City determined patrol officers' salary and benefits by their level of seniority.  This means that the longer an individual is employed with the City "the higher his salary and the greater his vacation and sick pay benefits." Groesch Aff., ¶ 10.  "[S]hift assignments and the entitlement to work overtime are [also] awarded on the basis of seniority." Id.

In that effort, he submitted an application for employment, underwent the necessary testing, and was placed on a police patrol officer eligibility roster, as instructed by Karola Baringer, then Personnel Director of the City and also an official of the Springfield Civil Service Commission. On January 9, 1989, Allin was rehired from the eligibility roster as a police patrol officer.

Once Allin returned to the City's employ, he became concerned about not receiving credit for his prior years of service. He expressed his concerns to Rick Walton, then Deputy Chief of Operation, who informed him that once his probationary period was completed he would be restored his earlier years of service. Allin filed a grievance with the Police Patrol Officer Union, Policemen's Benevolent and Protective Association (PBPA), Unit 5, because the City refused to credit him for his earlier years of service with the Police Department following the completion of his probationary period. The City opposed the grievance. Allin's grievance was submitted to arbitration, but the City again opposed. By a decision dated January 24, 1991, the arbitrator ruled against Allin, finding that he was not entitled to credit for his earlier years of service, from 1980 through 1986, for purposes of calculating his seniority, vacation and sick pay benefits. <u>Plaintiffs' Appendix to the Memorandum in Opposition to Defendant's Motion for</u>

5

Summary Judgment, Ex. A to Attachment 2, Report and Decision of Arbitration.

During the relevant time period at issue in this case, the City's Police Department was actively trying to recruit African-Americans and other minority groups. In so doing, the City worked closely with National Organization of Black Law Enforcement (NOBLE) and the Illinois State Police. Plaintiffs' Appendix to the Memorandum in Opposition to Defendant's Motion for Summary Judgment, Attachment 3, Deposition of John Harris (Harris Dep.) at 19. From October 1995 to June 2003, John Harris was Chief of Police of Springfield, Illinois Police Department. Id. at 7. His duties as the Chief of Police included budgeting, staffing, meetings, managing, directing and controlling. As the Chief of Police, Harris reported directly to the Mayor. Id. at 8. Chief Harris also played a limited role in hiring and recruiting new police officers. Id. at 9. Chief Harris testified in his deposition that the Mayor had the ultimate authority in implementing the policies of the Police Department and in hiring and recruiting police officers. Id. at 8, 11. Chief Harris admitted in his deposition that the actual hiring of police officers and the process leading to the hiring of police officers are governed by the Springfield Civil Service Commission. Id. at 11.

According to the City's former Director of the Department of Human Resources Gina Larkin, the City worked closely with three organizations to increase its minority recruitment: the local chapter of the NAACP, the Springfield Ministerial Alliance, and the Springfield Urban League.[3]   Larkin Dep. at 14-15.   The Human Resources Department maintained contact with the local organizations and used such contacts to recruit more minorities; it also advertised in newspapers that had a high minority readership to attract minority candidates.   Id. at 15.   Larkin testified that the City's practice of recruiting more minorities was in place before she started her job with the City in May of 1995.  Id. at 16.   Donald Kliment, the present Chief of the Police Department, testified that in 1999 and 2000, and in earlier years, the City sought to actively recruit minority police officers.[4]  Id. at 28.

Plaintiffs point to City patrol officer Donald Schluter as an individual who was treated more favorably by the City than they.   Schluter is an African-American male.  Schluter began employment with the City on

---

[3]Larkin was employed by the City from May of 1995 through May of 2003.

[4]Kliment has been the Chief of Police since June of 2003.  Plaintiffs' Appendix to the Memorandum in Opposition to Defendant's Motion for Summary Judgment, Attachment 5, Deposition of Don Kliment (Kliment Dep.) at 6.  Prior to that he was the President of the Union from 1996 through June of 2003.  Id. at 8.

April 4, 1994, but left in good standing on November 12, 1999.   On October 29, 1999, Schluter informed the Police Department that he was voluntarily terminating employment with the City effective November 12, 1999.  On November 9, 1999, Chief Harris received an interdepartmental memorandum from Schluter requesting a leave of absence.  Schluter made the request three days before his effective date of resignation because, in the event he changed his mind, he wished to return to the City's employ.  Schluter's request was denied.

Schluter was not eligible for a leave of absence because of his intention to work for a for-profit entity.[5]  Upon being informed of the denial, Schluter resigned from the Police Department to work for Norfolk Southern Railroad in St. Louis, Missouri, as a conductor.  Once Schluter submitted his resignation papers, his resignation became irrevocable according to the City ordinance.  See Springfield City Code § 36.60.  After three months of working as a conductor, Schluter wished to return to the Police Department and so he sent a letter to Chief Harris, on January 31,

---

[5]The City's leave of absence policy which applies to police officers provides in part that "[l]eaves of absence shall not be granted for the purpose of allowing an employee to work for a for-profit entity."  Plaintiffs' Appendix to the Memorandum in Opposition to Defendant's Motion for Summary Judgment, Attachment 11, Springfield City Code § 36.58 (a)(4).

2000, expressing his interest to return.  Schluter noted in the letter that "with the department's lack of minority recruitment, [he] could fill a void without the department having to spend additional funds in training someone."  Plaintiffs' Appendix to the Memorandum in Opposition to Defendant's Motion for Summary Judgment, Attachment 12, Schluter letter dated January 31, 2000.

By a letter dated February 14, 2000, Chief Harris informed Schluter that he had received the letter and that he would look into his request to return to the Police Department.  Chief Harris further stated in the letter that as soon as he heard from the Human Resources Department, he would contact him.  Plaintiffs' Appendix to the Memorandum in Opposition to Defendant's Motion for Summary Judgment, Attachment 15, Harris letter dated February 14, 2000.  At the time Schluter made his request to return, Chief Harris was aware of Schluter's race.  Chief Harris believed that Schluter was a qualified candidate and so wanted him to return as there was also a need for racial diversity on the Police Department.  In assisting Schluter's return to the City's Police Department, Chief Harris considered Schluter's race.  Plaintiffs' Appendix to the Memorandum in Opposition to Defendant's Motion for Summary Judgment, Attachment 17, Deposition

of John Harris taken in relation to Springfield Policemen's Benevolent and Protective Association, Unit No. 5 v. City of Springfield, et al., Case No. 00 MR 180, pending before the Circuit Court of Sangamon County at 26. Chief Harris believed that, in order to return Schluter to the City's employ, an action from the Springfield City Council was necessary.  Harris Dep. at 40.  In general, if an action from the City Council was required, Chief Harris would make a request to the Mayor's office.  The Mayor would then make recommendations to the City Council.  Id. at 42-43.

At the time Schluter made his request to return to the City's employ, the City was in the testing phase to create an eligibility roster.  Kliment Dep. at 18-19.  Chief Harris believes that he discussed the Schluter situation with Frank McNeil, an alderman of Ward 2 of the City of Springfield and a member of the Springfield City Council.  Harris Dep. at 45.  McNeil testified in his deposition that Harris would generally talk to him about minority recruiting issues.  Plaintiffs' Appendix to the Memorandum in Opposition to Defendant's Motion for Summary Judgment, Attachment 7, Deposition of Frank McNeil (McNeil Dep.) at 6. McNeil testified that he did not recall taking a position on Schluter's salary, seniority or the method of calculating his sick and vacation pay upon his

return to work.  <u>Id.</u> at 39-40.  McNeil testified that one of the reasons he considered in supporting Schluter's return was the fact that he was interested in having qualified minorities on the Police Department.  <u>Id.</u> at 41.  McNeil further testified that members of the City Council were also concerned about the lack of diversity in the Police Department.  <u>Id.</u> at 23. McNeil testified that he was aware that Schluter had a good work record while he was on the Police Department and that he was a qualified officer. <u>Id.</u>  McNeil admitted that, at the time the passage of an ordinance to allow Schluter's return was under consideration, Chief Harris could not have granted a retroactive leave of absence without the City Council enacting an ordinance.  <u>Id.</u> at 43.

On March 28, 2000, the City passed Ordinance 198.3.00 (the Schluter Ordinance) which enabled Schluter to return as a City patrol officer with his previous level of seniority.  McNeil sponsored the passage of the Schluter Ordinance.  McNeil testified that the Schulter Ordinance was not a change in City policy because the Ordinance did not, on its face, amend § 36.58 (a)(4) of the Springfield City Code, which provides that "[l]eaves of absence shall not be granted for the purpose of allowing an employee to work for a for-profit entity."  <u>Springfield City Code §</u>

36.58(a)(4); McNeil Dep. at 30-31.  McNeil further testified as follows:

> Q.    Okay.  All right.  I am curious and as I read the four corners of the [Schluter] ordinance and specifically Sections 1, 2, 3 and 4 of the ordinance that appear on page 2 of the ordinance only applies [sic] to Don Schluter and his efforts to come back to the city.
>
> A.    I would say that's correct.
>
> Q.    And if a month later there was another police officer similarly situated to Don Schluter who also wanted to come back the ordinance does not address that situation.
>
> A.    I would say no, but I would say I think the way we looked at it would have to be a case by case basis.
>
> Q.    Why was that?
>
> A.    And I think that as I recall and, you know, this is still my fuzzy recollection, each case had to be handled on its own merits.

McNeil Dep. at 50-51.  The face of the Schluter Ordinance recited in part that rehiring of Schluter promoted diversity in the ranks of the Springfield Police Department, which was in the public interest.[6]

---

[6]The Schluter Ordinance specifically provided as follows:

**AN ORDINANCE GRANTING A RETROACTIVE LEAVE OF ABSENCE TO POLICE PATROL OFFICER DONALD ANTHONY SCHLUTER**

198.3.00

WHEREAS, Donald Anthony Schluter began his employment a police officer in the Springfield Police Department on April 4, 1994; and,

WHEREAS, on November 9, 1999, Donald Anthony Schluter requested a 3 month leave of absence; and,

WHEREAS, Police Chief John Harris denied that leave of absence as a result of Section 36.58(a)(2)(4) of the City of Springfield Code of Ordinances; and,

WHEREAS, Donald Anthony Schluter voluntarily terminated his employment as a police officer with the Springfield Police Department on November 12, 1999; and

WHEREAS, Donald Anthony Schluter was a police officer in good standing when he chose to voluntarily terminate his employment with the Springfield Police

Department; and,

   **WHEREAS**, at the time of Donald Anthony Schluter's voluntary separation from his employment as a police officer in the Springfield Police Department he was assigned as a Neighborhood Patrol Officer to Southeast High School where, all times, he performed the duties of his position to the satisfaction of his superiors and supervisors within the Springfield Police Department; and,

   **WHEREAS**, on January 31, 2000, Donald Anthony Schluter requested that he be allowed to return to his former position as a police officer with the Springfield Police Department; and,

   **WHEREAS**, if Donald Anthony Schluter had been granted a leave of absence on November 9, 1999, he would have been eligible to return to his former position of police officer with the Springfield Police Department on January 31, 2000 pursuant to Section 36.58(a) of the City of Springfield Code of Ordinances; and,

   **WHEREAS**, there is currently a need for police officers in the Springfield Police Department; and,

   **WHEREAS**, there is currently no Police Patrol Officer Eligibility List in place from which new police officer candidates may be hired; and,

   **WHEREAS**, Police Chief John Harris has requested that he be allowed to return Donald Anthony Schluter to his former position as a police officer in the Springfield Police Department; and,

   **WHEREAS**, it costs the City of Springfield $2,200.00 to send a new police officer candidate to basic training at a certified police academy; and

   **WHEREAS**, if Donald Anthony Schluter were returned to his former position as a police officer in the Springfield Police Department, the City would save the taxpayers of the City of Springfield the expense of having to train a new police officer candidate to fill the position formerly held by Donald Anthony Schluter; and,

   **WHEREAS**, it cost the City of Springfield $350.00 to have a new police officer candidate under go [sic] a pre-employment medical screening necessary to ensure that the candidate has the physical capabilities required to perform the duties of a police officer in the Springfield Police Department; and;

   **WHEREAS**, it cost the City of Springfield $352.00 to have a new police officer candidate under go [sic] a pre-employment psychological screening to ensure that the candidate has the mental capabilities required to perform the duties of a police officer in the Springfield Police Department; and;

   **WHEREAS**, if Donald Anthony Schluter were returned to his former position as a police officer in the Springfield Police Department, the City would save the taxpayers of the City of Springfield the expense of the medical and psychological screening which would be required if a new police officer candidate were hired to fill the position formerly held by Donald Anthony Schluter; and,

   **WHEREAS**, it was not the intent of the City Council, in enacting Section 36.58(a)(2)(4) of the City of Springfield Code of Ordinances, to preclude the Chief of the Springfield Police Department from returning a qualified individual who voluntarily

The Schluter Ordinance applied solely to Schluter and no one else, meaning no other individuals who wished to return to the City's employ could return and be granted a retroactive leave of absence under the Ordinance, unless a similar and separate ordinance was passed providing for such a leave.  Chief Harris testified that he was not involved in the decision to enact an ordinance that applied only to Schluter.  <u>Harris Dep</u>. at 47.  The Schluter Ordinance authorized Schluter to be reinstated to his previous rank of patrol officer, without having to go through any testing process or be placed on an eligibility roster, which is generally required.  The only loss of seniority Schluter had was for the four-month period he was gone.  Upon

---

terminated his employment in good standing to his former position as a police officer in the Springfield Police Department under the circumstances set forth herein;

**WHEREAS**, it is in the public interest and furthers the important public goal of ensuring public safety to have qualified individuals serving as police officers in the Springfield Police Department; and,

**WHEREAS**, it is in the public interest to have a diversity in the ranks of the Springfield Police Department; and,

**NOW THEREFORE, BE IT ORDAINED BY THE COUNCIL OF THE CITY OF SPRINGFIELD, ILLINOIS:**

<u>Section 1</u>:  The City Council of the City of Springfield, Illinois hereby grants Donald Anthony Schluter a retroactive leave of absence.

<u>Section 2</u>:  Donald Anthony Schluter shall be returned to his position as a Springfield police officer upon his immediate return from leave of absence;

<u>Section 3</u>:  Donald Anthony Schluter shall not accrue any seniority, vacation leave, sick leave[,] personal leave or other benefits of employment for the period in which he was absent from his position as a police officer in the Springfield Police Department;

<u>Section 4</u>:  This ordinance shall become effective immediately upon its passage.

<u>Plaintiffs' Appendix to the Memorandum in Opposition to Defendant's Motion for Summary Judgment</u>, Attachment 10, <u>Schluter Ordinance</u>.

his return, Schluter received credit for his prior years of service. Plaintiffs allege that they ". . . received wages and benefits calculated under a method which provides each of them less favorable treatment than that provided to Donald A. Schlueter [sic]." Complaint (d/e 1), ¶ 14.

Shortly following the passage of the Schluter Ordinance, the Springfield PBPA, Unit 5, filed a lawsuit against both the City and Schluter challenging the enactment of the Schluter Ordinance. The Court takes judicial notice of the following: (1) the lawsuit filed in the Circuit Court of Sangamon County, Illinois, Springfield Policemen's Benevolent and Protective Association, Unit 5 v. City of Springfield, Illinois, Case No. 00 MR 180; (2) the August 17, 2001, Order entered by the Circuit Court of Sangamon County; and (3) the April 26, 2002, Order issued by the Illinois Appellate Court.[7] See Toney v. Burris, 829 F.2d 622, 626-27 (7th Cir. 1987) ("Federal courts must take judicial notice of the statutory and common law of any state of the union without pleading or proof. This is

---

[7]The state trial court granted the Union partial summary judgment finding that the portion of the Schluter Ordinance giving Schluter his prior years of seniority credit was illegal. The Appellate Court, however, reversed the decision of the trial court and dismissed the case with prejudice. The Appellate Court held that the Union lacked standing to bring suit. Plaintiffs' Appendix to the Memorandum in Opposition to Defendant's Motion for Summary Judgment, Attachment 18, Circuit Court Order entered August 17, 2001 & Illinois Appellate Court Order entered April 26, 2002.

especially true of the laws of the state in which the district court sits. The rule applies with equal force to matters of public record such as state statutes, city charters, and city ordinances.") (internal quotations and citations omitted).

According to the Plaintiffs, they wanted to see the progress of the lawsuit initiated by the Union before they decided to file their own lawsuit. On December 11, 2002, Plaintiffs formally sent a letter to Chief Harris expressing their interest in being restored their prior years of service as the City had done for Schluter. Plaintiffs' Appendix to the Memorandum in Opposition to Defendant's Motion for Summary Judgment, Attachments 13 & 14, Groesch, Shaffer and Allin Memorandum dated December 11, 2002.[8]

_____

[8]The Memorandum states in part:

The undersigned seek parity in treatment with the treatment with [sic] the City has provided Mr. Schluter. The facts and circumstances surrounding his resumption of employment with the City are no different than our situations. According, we request that:

A.     our seniority be readjusted so that our years of service prior to leaving the employ of the Department would be credited to each of us for seniority purposes;

B.     our salaries under the applicable pay scales be readjusted so that our years of service prior to leaving the employ of the Department would be utilized in determining our pay level;

C.     we receive a sum of money representing the difference between what our salary has been since returning to the employ of the City and what it would have been had it been calculated utilizing our earlier years of service;

D.     our vacation entitlement be readjusted so that our earlier years of service are credited for purposes of determining our vacation benefits; and

In their Memorandum, the Plaintiffs requested that they be treated the same way as the City had treated Schluter in crediting him for his earlier years of service with the Police Department.  In short, Plaintiffs were requesting credit for their prior years of service, which would require an action by the Springfield City Council.  Chief Harris did not follow through on their requests.  When asked what he thought distinguished Schluter's situation from the situations of Groesch, Allin and Shaffer, Chief Harris testified as follows:

> Q.     Okay.  In your mind is there a difference between Tony Schluter's circumstances and the circumstances of Groesch, Allin and Shaffer?
> A.     Yes.
> Q.     And what is the difference that you see in their positions?
> A.     Well, one is that there was, for Groesch specifically he was granted or requested and granted a leave of absence and

---

E.     we be restored the unused sick days we forfeited when we left the Department.

We understand that the relief we are requesting may require the approval of the Springfield City Council.  We further understand that you supported the ordinance which was adopted by the City Council for Mr. Schluter.  We ask that you provide similar support with respect to the relief we are requesting.

We are prepared to meet with you to discuss our concerns.  We would appreciate it if you or a representative of your office would contact us within the next fourteen (14) days so that we might arrange a time to meet for the purpose of discussing these concerns.  We thank you for your anticipated cooperation.

Groesch, Shaffer and Allin Memorandum dated December 11, 2002.

> then he was gone an extreme amount of time.  The others were
> I believe just gone a large amount of time.  Those are the
> differences I see.
> Q.      And in Tony Schluter's case he was gone a much shorter
> period of time?
> A.      Much shorter period of time and had requested a leave
> of absence but had been denied.
> Q.      In your mind is there a difference between the fact that
> Officers Groesch, Allin and Shaffer had already been rehired and
> had worked for a number of years before they made their
> request for these back benefits and the fact that Tony Schluter
> was provided with that before he was actually rehired.
> A.      That is a difference.

Harris Dep. at 69-70.  McNeil testified that Chief Harris never brought to

his attention the requests made by the Plaintiffs.  Id. at 57.

Plaintiffs cite a report prepared by the law firm of Husch &

Eppenberger, LLC, at the request of the City.  Plaintiffs' Appendix to the

Memorandum in Opposition to Defendant's Motion for Summary

Judgment, Attachment 16 Husch & Eppenberger Report dated April 9,

2003 (Husch Report).  The City commissioned Husch & Eppenberger, LLC,

to investigate charges of racism in the Police Department.  The Husch

Report states, in part:

> Many expressed resentment that women and minorities
> appeared to get special treatment, in hiring, placement, and
> advancement.  Based upon several interviews, including Chief
> Harris', race and gender *are* taken into consideration at various
> stages, including hiring, work assignments, promotions, and

determination of disciplinary action or determination of the need for an internal affairs investigation.

Id. at 58-59 (emphasis in original).

On April 3, 2003, Plaintiffs filed a suit against the City in the Illinois Circuit Court for the Seventh Judicial Circuit, alleging a cause of action under the equal protection clause of Article I, Section 2 of the Illinois Constitution of 1970. On November 10, 2003, the Circuit Court issued an order dismissing Plaintiffs' state court complaint for failure to file within the application statute of limitations under state law. On March 2, 2004, Plaintiffs filed a charge of discrimination with the Equal Employment Opportunity Commission. The Illinois Appellate Court for the Fourth District affirmed the judgment of the Circuit Court on July 22, 2004. Plaintiffs filed the instant lawsuit on July 27, 2004.

## ANALYSIS

The Defendant moves for summary judgment. At summary judgment, the Defendant must present evidence that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The Court must consider the evidence presented in the light most favorable to the Plaintiffs. Any doubt as to the existence

of a genuine issue for trial must be resolved against the Defendant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Once Defendant has met its burden, Plaintiffs must present evidence to show that issues of fact remain with respect to an issue essential to their case, and on which they will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). When viewed in the light most favorable to the Plaintiffs, issues of fact exist for trial.

As a preliminary matter, the Court notes that by a Text Order dated July 6, 2006, this Court dismissed with prejudice all claims for monetary damages accruing to Plaintiff Shaffer before January 19, 2005. After Shaffer filed for bankruptcy on January 19, 2005, the City purchased Shaffer's then existing claim from the Trustee in bankruptcy. Accordingly, Shaffer is barred from pursuing any claim for monetary damages accruing prior to January 19, 2005.

The Court further notes that Defendant requests summary judgment on Plaintiffs' claim for damages arising prior to April 3, 2003, on the grounds of res judicata, collateral estoppel and/or the statute of limitations. Defendant initially requested the dismissal of such claims in its Motion to

Dismiss (d/e 4) based on the above grounds.  As noted earlier, Plaintiffs filed a suit against the City with the Illinois Circuit Court for the Seventh Judicial Circuit on April 3, 2003, alleging a cause of action under the equal protection clause of Article I, Section 2 of the Illinois Constitution of 1970. In an order dated November 10, 2003, the Circuit Court dismissed Plaintiffs' state court complaint for failure to file within the applicable statute of limitations under state law.  In a decision dated July 22, 2004, the Appellate Court of Illinois for the Fourth District affirmed the judgment of the Circuit Court.

In the present case, Plaintiffs allege that with every paycheck they are paid, they are treated less favorably than Schluter.  In its February 1, 2005, Opinion this Court noted, relying on the Seventh Circuit case law, that every paycheck Defendant pays each Plaintiff is a separate, discrete, potentially discriminatory act, including the paychecks paid to the Plaintiffs after the Plaintiffs filed their April 3, 2003, state court complaint.  This Court reasoned as follows:

> Therefore, under [Perkins v. Bd of Trustees of Univ. of Ill.], Plaintiffs' claims under Title VII, which arise from paychecks received after they filed their April 3, 2003, state court complaint, do not share an "identity of cause of action" with the state court action.  Instead, they are allegedly "wrongful

21

events . . . separated by time and function . . ." from the allegedly discriminatory paychecks paid to the Plaintiffs before the state court claim was filed. <u>Perkins</u>, 116 F.3d [235, 237 (7th Cir. 1997)]. For that reason, Plaintiffs' claims under Title VII, arising from paychecks paid to them after the state court claim was filed on April 3, 2006, are not barred by the doctrine of res judicata.

Further, the same logic extends to Plaintiffs' claims arising under 42 U.S.C. § 1983 . . . Therefore, each possibly discriminatory paycheck received by the Plaintiffs after they filed their April 3, 2003, state court claim is a separate cause of action, not barred by the doctrine of res judicata.

<u>Opinion dated February 1, 2005 (d/e 11)</u> at 15-16. Implicit in that ruling is the conclusion that Plaintiffs' claims for damages arising prior to April 3, 2003, are barred by the doctrine of res judicata.[9] As such, Defendant is entitled to summary judgment on Plaintiffs' claims for damages arising prior to April 3, 2003, on the basis of res judicata.[10]

The Court further finds that Plaintiffs' claims arising before the date of the state trial court judgment on November 10, 2003, are also barred based on res judicata. Plaintiffs prayed for injunctive relief for on-going

---

[9]<u>See</u> <u>Discussion in February 1, 2005, Opinion</u> at 8-16.

[10]Without any citation to authority, Plaintiffs contend that, under Title VII, damages are limited to a period not greater than two years prior to the date a charge of discrimination was filed. Based on this, Plaintiffs argue that their claim for damages under the Act could extend back to March 2, 2002, given that they filed their charges of discrimination with the EEOC on March 2, 2004. This issue was already addressed by this Court in the February 1, 2005, Opinion. <u>See</u> <u>February 1, 2005, Opinion</u> at 17 n. 3. Therefore, the Court need not address this issue.

injuries in their state court complaint.  If their suit had been successful, the prayer would have covered all damages leading up to trial (had the state court action gone to trial).  Accordingly, all claims arising before November 10, 2003, the date of the state trial court judgment, are barred by claim preclusion, but claims arising from allegedly discriminatory wages paid after November 10, 2003, are actionable (as long as they satisfy the relevant statute of limitations).  Defendant is thus entitled to summary judgment on Plaintiffs' claims arising before the date of the state trial court judgment on November 10, 2003.  The Court now turns to the substantive issues.

A.     REVERSE RACE DISCRIMINATION CLAIMS UNDER TITLE VII (COUNTS I, III and V)

In Counts I, III, and V, Plaintiffs Groesch, Shaffer, and Allin respectively allege discriminatory treatment in employment based on their race, in violation of 42 U.S.C. § 2000e et seq.  Title VII provides: "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1).  This provision prohibits disparate treatment in employment.

23

Disparate treatment in employment is often hard to prove.  Thus, the courts have developed both direct and indirect methods of presenting evidence at summary judgment to show that issues of fact exist.  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  At any trial, however, a plaintiff bears the burden to prove racial discrimination and retaliation.  <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 511 (1993).  The Plaintiffs may use either the direct or indirect method to show that issues of fact exist on their Title VII disparate treatment claims in Counts I, III, and V and on their § 1983 equal protection claims on Counts II, IV, and VI.  <u>Scaife v. Cook County</u>, 446 F.3d 735, 739 (7th Cir. 2006); <u>Forrester v. Rauland-Borg Corp.</u>, 453 F.3d 416 (7th Cir. 2006); <u>Eiland v. Trinity Hosp.</u>, 150 F.3d 747, 750 (7th Cir. 1998); <u>Stone v. City of Indianapolis Public Utilities Div.</u>, 281 F.3d 640 (7th Cir. 2002); <u>Riordan v. Kempiners</u>, 831 F.2d 690, 695-96 (7th Cir. 1987).

To establish disparate treatment under the direct method, a plaintiff presents direct evidence that he suffered an adverse employment action and that his race was a motivating factor.  An adverse employment action is a loss of compensation or benefits, such as demotion or denial of promotion, or a material reduction in duties and responsibilities.  <u>Smart v. Ball State</u>

University, 89 F.3d 437, 441 (7th Cir. 1996).  Furthermore, direct evidence means evidence that establishes each element without resort to inferences from circumstantial evidence.  Stone, 281 F.3d at 644.

Plaintiffs have presented sufficient evidence to establish that they suffered an adverse employment action.  The evidence shows that the adverse employment action in this case occurred when the Plaintiffs renewed their requests for restoration of service credit in December of 2002, seeking the same benefits that the City had afforded to Schluter under the Ordinance, and the City Council failed to act upon the Plaintiffs' requests. Even though the Plaintiffs did not present their requests to the City Council directly, the evidence in the record supports an inference that the decisionmakers (members of the City Council) knew that there were police officers other than Schluter who wanted the same benefits that were afforded to Schluter under the Schluter Ordinance.  The Schluter Ordinance applied solely to Schluter and no one else.  As quoted above, the face of the Schluter Ordinance recited in part:

> **NOW THEREFORE, BE IT ORDAINED BY THE COUNCIL OF THE CITY OF SPRINGFIELD, ILLINOIS:**
> **Section 1:**  The City Council of the City of Springfield, Illinois hereby grants Donald Anthony Schluter a retroactive leave of absence.

25

**Section 2**:  Donald Anthony Schluter shall be returned to his position as a Springfield police officer upon his immediate return from leave of absence;

**Section 3**:  Donald Anthony Schluter shall not accrue any seniority, vacation leave, sick leave[,] personal leave or other benefits of employment for the period in which he was absent from his position as a police officer in the Springfield Police Department;

**Section 4**:  This ordinance shall become effective immediately upon its passage.

Schluter Ordinance.  The fact that the Schluter Ordinance was drafted to apply only to one person supports an inference that the City Council knew that other returning  officers wished to have their prior service credit at the time the Schluter Ordinance was enacted.  The evidence that the City formally opposed Allin's grievance filed in 1991 when he did not receive his prior service credit, as promised by the then Deputy Chief of Operation, combined with evidence that Groesch had sought similar relief from an Alderman in 1994, all supports an inference that the City Council knew at the time the Schluter Ordinance was passed that others wanted their prior service credit.[11]  Additionally, the instant lawsuit and the deposition of

---

[11]According to Groesch, in 1994 he contacted Alderman Andrews inquiring whether the City would enact an ordinance allowing experienced officers to return to the Police Department without going through the hiring process, as the City of Champaign had done.  Groesch states that Andrews later told him that he had discussed the matter with other members of the Springfield City Council but could not garner any support for the idea.

Alderman McNeil further support an inference that the City Council was put on notice of the Plaintiffs' requests and their requests have not been granted.  The Plaintiffs have provided evidence that they suffered an adverse employment action.

Plaintiffs claim that they have presented direct evidence of discrimination.   Direct evidence consists of evidence that proves discrimination without the need for inference or presumption.  Troupe v. May Dept. Stores Co., 20 F.3d 734, 736 (7th Cir. 1994).  Such evidence includes a direct acknowledgment of discrimination or circumstantial evidence which shows an intent to discriminate.  Id. Plaintiffs first point to the enactment of the Schluter Ordinance.  Plaintiffs contend that the enactment of the Schluter Ordinance, benefitting solely one individual, namely Schluter, reveals discriminatory intent on the part of the City.  The face of the Schluter Ordinance specifically provides that one of the reasons for enacting the Ordinance is to promote diversity in the ranks of the Springfield Police Department, as it is in the public interest.  This language shows that in enacting the Schluter Ordinance the Springfield City Council considered Schluter's race as a factor in re-hiring him.  However, the enactment of this Ordinance in March of 2000 does not state why the

Plaintiffs were not given credit for their earlier service.  Plaintiffs need to rely on inference to make their case; therefore, they lack direct evidence of a discriminatory intent.

Plaintiffs next cite statements made by Chief Harris in which he testified that he supported and recommended the passage of the Schluter Ordinance because he wished to have an African-American return to the Police Department, as retention of minorities on the Police Department was important to him.  Any statement attributed to Chief Harris cannot constitute direct evidence of discriminatory intent, because Chief Harris was not a decisionmaker.[12]  In other words, Harris did not have a final say in authorizing Schluter's return.  Nor did he have a final say in enacting an ordinance for the purpose of restoring each of the Plaintiffs' prior years of service.

More importantly, Harris' statements concerning his support for Schluter's return and the enactment of the Schluter Ordinance, as well as his statements relating to the City's increased efforts to recruit minorities in the Police Department, are not direct evidence of discriminatory intent

---

[12]"A decisionmaker is the person responsible for the contested decision."  Davis v. Con-Way Transp. Central Express, Inc., 368 F.3d 776, 783 (7th Cir. 2004).

on the part of the City against the Plaintiffs with respect to the adverse employment action at issue here.  One could favor increasing minorities on the police force and returning Officer Schluter to duty without intending to discriminate against the Plaintiffs.  In order to create a genuine issue of material fact based on direct evidence, Plaintiffs must point to admissions by decisionmakers that race was a motivating factor in giving preferential treatment to Schluter and not the Plaintiffs.  The only statements that Plaintiffs point to are statements attributed to Harris, a non-decisionmaker. See Rogers v. City of Chicago, 320 F.3d 748, 753 (7th Cir. 2003).  Plaintiffs have failed to present evidence establishing a direct connection between the retroactive leave of absence afforded to Schluter and the alleged adverse employment action at issue in this case.  As such, Chief Harris' statements do not indicate intentional discrimination without inferring or presuming the actual decisionmakers' (members of the City Council) motivation.

Plaintiffs also cite to Schluter's letter to Chief Harris in which he stated that there was a lack of minorities on the Police Department. However, this statement was made by Schluter, not a City official.  The statement is also a statement of fact about the make-up of the Police Department.  The statement does not reveal a discriminatory intent on the

part of the City Council, or anyone else, against the Plaintiffs.  This statement therefore does not constitute direct evidence of intentional discrimination without inferring or presuming the City Council's motivation.

Plaintiffs further cite to statements made by McNeil, the Schluter Ordinance sponsor, who stated that he supported the idea of recruiting more minorities on the Police Department and that Schluter's race was one of the factors he considered in advocating the passage of the Ordinance. The fact that McNeil supported Schluter's return to the Police Department, because he was interested in promoting diversity, does not show that he or any other member of the City Council discriminated against the Plaintiffs with respect to the adverse employment action at issue.

Plaintiffs next point to the City's increased efforts to recruit minorities in the Police Department during the time period Schluter sought to return to the City's employ.  Plaintiffs contend that Harris, Kliment, and Larkin have all testified that the City was aggressively trying to increase its efforts to recruit African-Americans in the Police Department.  The fact that the City increased its efforts to recruit minorities does not show that the City discriminated against the Plaintiffs.  It only shows that the City

encouraged qualified minority candidates to apply for positions in the Police Department.  Having a racially diverse police department is a worthy goal. These efforts do not constitute direct evidence of discriminatory intent on the part of the Springfield City Council with respect to these Plaintiffs.

Plaintiffs also point to the fact that Chief Harris never offered any reason for supporting the restoration of Schluter's earlier years of service and denying the same benefits to them.  However, in his deposition, Chief Harris stated that the time the Plaintiffs were gone from the department was much greater than that for Schluter and the fact that the Plaintiffs made their request for prior service credit after their rehire were differences between them and Schluter.  The fact that Harris did not state these reasons earlier does not provide direct evidence of discrimination by the Springfield City Council.

Finally, Plaintiffs cite to the Husch Report which shows that the City provided preferences to minorities, including African-Americans, with respect to employment on the Police Department.  As quoted above, the Husch Report provides in part:

> Many expressed resentment that women and minorities appeared to get special treatment, in hiring, placement, and advancement.  Based upon several interviews, including Chief

> Harris', race and gender *are* taken into consideration at various
> stages, including hiring, work assignments, promotions, and
> determination of disciplinary action or determination of the
> need for an internal affairs investigation.

<u>Husch Report</u>, pp. 58-59 (emphasis in original). As an initial matter, the
Court notes that the City challenges the admissibility of the Husch Report
on the basis that it is not a pleading, deposition, answer to interrogatory,
admission or an affidavit as required under Fed. R. Civ. P. 56(a). The City
additionally argues that the Husch Report is inadmissible because it was
never disclosed by the Plaintiffs in their Rule 26 disclosure. The Report
appears to be an admission of a party opponent because it was prepared by
the Police Department's agent, and the subject matter of the statement was
within the scope of its agency. <u>Fed. R. Evid</u>. 801(d)(2)(D). Further,
statements attributed to Chief Harris appear to be an admission of a party
opponent because the statement was within the scope of Chief Harris'
agency. <u>Fed. R. Evid.</u> 801(d)(2)(D) & 805. Also, the Plaintiffs had no
reason to disclose the Report in their Rule 26 disclosure because the Report
itself was prepared at the request of the City for the benefit of the City.
Based on what has been provided, at least parts of the Report appear to be
admissible as statements by a party's agent. <u>Fed. R. Evid.</u> 801(d)(2)(D).

Turning to the merits, the Husch Report does not constitute direct evidence of intent.  The Plaintiffs have failed to present evidence showing a direct connection between the findings of the Husch Report and the adverse employment action to which they were subjected.[13]   Because Plaintiffs have failed to present direct evidence of discrimination, the Court turns to its analysis of whether discriminatory intent has been proven under the indirect method.

If a plaintiff does not have direct evidence of disparate treatment, he may proceed at summary judgment under the indirect method. In a disparate treatment case, a plaintiff must present evidence of a prima facie case that: (1) he is a member of a protected class; (2) he was meeting the employer's reasonable expectations; (3) despite this, he suffered an adverse employment action; and (4) a similarly-situated person outside of the

---

[13]Plaintiffs appear to rely on Ballance v. City of Springfield to argue that the Husch Report constitutes direct evidence.  See Ballance, 424 F.3d 614 (7th Cir. 2005). Plaintiffs' reliance on Ballance is misplaced.  In Ballance, the Seventh Circuit found that the Report in question satisfied one of the elements needed to establish a prima facie case of reverse racial discrimination under the indirect method of proof, namely, that background circumstances exist to show an inference that the employer has reason or inclination to discriminate against whites.  The Seventh Circuit explained in Ballance that the Husch Report in question supported "the inference that the police department, through Chief Harris, gave preferences to minorities and women in the disciplinary process." Id. at 618.  The Seventh Circuit did not find that the Husch Report constituted direct evidence.  Moreover, in this case specifically, the Husch Report does not show intent to discriminate without inferring or presuming the motive of the decisionmakers.

protected class was treated more favorably.  See Gorence v. Eagle Food Center, Inc., 242 F.3d 759, 765 (7th Cir. 2001).  To be similarly-situated, a person must be directly comparable in all respects.  Burks v. Wisconsin Dept. of Transp., 464 F.3d 744, 751 (7th Cir. 2006).  In addition to proving the above factors, a Title VII plaintiff claiming reverse racial discrimination must further demonstrate "that 'background circumstances' exist to show an inference that the employer has 'reason or inclination to discriminate invidiously against whites' or evidence that 'there is something 'fishy' about the facts at hand.'"  Ballance, 424 F.3d at 617 (citing Phelan v. City of Chicago, 347 F.3d 679, 684-85 (7th Cir. 2003); Mills v. Health Care Serv. Corp., 171 F.3d 450, 455-57 (7th Cir. 1999)); see also Ineichen v. Ameritech, 410 F.3d 956, 959 (7th Cir. 2005).

If Plaintiffs can establish the above elements, then the burden shifts to the Defendant to come forward with a legitimate, non-discriminatory reason for its alleged adverse employment action.  Once the Defendant presents its reason, the burden shifts to the Plaintiffs to show that Defendant's reason is a pretext, meaning the decisionmakers who made the decision did not honestly believe that the stated reason was the basis for their decision.  Bell v. E.P.A., 232 F.3d 546, 549-50 (7th Cir. 2000).

As discussed above, Plaintiffs have presented sufficient evidence to show that they suffered an adverse employment action.  Also, it is undisputed that the Plaintiffs performed their job according to the City's legitimate expectations and that they are members of a protected class. Accordingly, the next issue is whether Plaintiffs have presented sufficient evidence to show that they are similarly situated to Schluter in all material respects.  Employees are similarly situated if they are directly comparable in all material respects.  Ineichen, 410 F.3d at 960.  This means that the Plaintiffs must "show not only that the employees reported to the same supervisor, engaged in the same conduct, and had the same qualifications, but also show that there were no 'differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them.'" Id. at 960-61 (quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)).

Plaintiffs claim that Schluter is directly comparable to them in all material respects.  It is undisputed that the Plaintiffs and Schluter left the City's employ in good standing to pursue other career opportunities with for-profit corporations.  It is further undisputed that the Plaintiffs and Schluter sought to return to the City's employ following their voluntary

resignations from the Police Department.  Defendant, however, argues that Plaintiffs are not similarly situated to Schluter because Schluter left the City's employ for about four months before he was rehired by the City,  and each of the Plaintiffs was gone for several years.  Groesch was away for about 8 years; Shaffer was away for about 6 years; and Allin was away for about 2 years.  The evidence, however, reveals that Allin attempted to return to the City's employ within six months after leaving the Police Department.  In his effort to return, Allin submitted an application for employment, underwent the necessary testing, and was placed on a police patrol officer eligibility roster, as instructed by the then Personnel Director of the City.  Allin was finally rehired by the City in January of 1989.  Similarly, Groesch attempted to return to the City's employ in 1989, shortly following his voluntary resignation in 1988.  Between 1989 and September of 1996, he submitted applications, tested to be placed on eligibility lists, and was finally rehired by the City in September of 1996.

The City also argues that the Plaintiffs have not presented evidence showing that the circumstances of the City in 1989 (when Allin was rehired), 1993 (when Shaffer was rehired), or 1996 (when Groesch was rehired) were similar to the circumstances in 2000 (when Schluter was

rehired). The Plaintiffs' theory, however, is based on the December 2002 renewal of their request for reinstatement of their seniority. There is no evidence in the record showing that the make-up of the City Council in 2002 was different from the make-up of the City Council in 2000, when the Schluter Ordinance was enacted.

Plaintiffs must next demonstrate that background circumstances exist to show an inference that the City has a reason or inclination to discriminate invidiously against them because of their race. The Husch Report indicates that around the time period at issue in this case, the Police Department gave preferential treatment to women and minorities in hiring, placement, and advancement. See Ballance, 424 F.3d at 618 (the Husch Report supports "the inference that the police department, through Chief Harris, gave preferences to minorities and women in the disciplinary process."). This evidence suggests that background circumstances exist to show an inference that the City may discriminate against whites. Id. Plaintiffs have, therefore, presented sufficient evidence of a prima facie case of discrimination.

The Defendant must therefore present a non-discriminatory reason for restoring Schluter's prior service credit, but denying the same benefit to

the Plaintiffs.  The City points to nine non-discriminatory reasons for its actions, as set forth on the face of the Schluter Ordinance: (1) Schluter was an officer in good standing when he voluntarily left the City's employ; (2) there was a need for police officers; (3) there was no Eligibility List in place from which to hire; (4) Chief Harris wished to return Schluter to service; (5) the City would save $2,200.00 by not sending Schluter to the Police Academy; (6) the City would save $350.00 for pre-employment medical screening; (7) the City would save $352.00 for pre-employment psychological screening; (8) it was in the public interest and furthered the goal of public safety to have qualified individuals serving as police officers of the City; and (9) it was in the public interest to have diversity in the police force.  The City also argues that the time frame that the Plaintiffs were off the police force was much greater than that for Schluter and that that difference justifies not restoring their earlier service credits.  Finally, the City argues that the enactment of the Schluter Ordinance constituted a change in City policy, and Plaintiffs were not entitled to have the change applied retroactively to them.

Plaintiffs must now present evidence that the stated reasons are pretextual.  A stated reason is a pretext if the evidence indicates that the

stated reason is not the actual reason.  <u>Rudin v. Lincoln Land Community College</u>, 420 F.3d 712, 724 (7th Cir. 2005).  The evidence does not need to indicate that the actual reason was an improper one, only that the stated reason is not true.  There is circumstantial evidence to support a finding that the first 8 stated reasons were not the actual reason and that race was a motivating factor in affording the benefit to Schluter, but denying the same to the Plaintiffs.  The majority of the justifications offered by the City in treating Schluter more favorably than the Plaintiffs would equally apply to the Plaintiffs.  Plaintiffs, like Schluter, were officers in good standing when they voluntarily left the City's employ.  According to Larkin, the Police Department would create an eligibility list if there was a need for police officers.  When the City had a need to recruit new officers, the City would test interested individuals and then create a list.  This evidence shows that when the Plaintiffs attempted to return to the City's employ, there was a need for police officers as well.

The savings gained in training and in medical and psychological examination would apply equally to the Plaintiffs.  The evidence further shows that the cost saving justification with respect to training is not a credible reason because, according to Chief Harris, the City was not required

to pay the expense of training new police recruits.  Moreover, the cost saving justification offered by the City does not explain why the Plaintiffs, unlike Schluter, were not restored their prior service credit once they renewed their requests for such credit in December of 2002.[14]

The City's proffered reason that Chief Harris recommended Schluter's return does not appear to be the reason because Chief Harris stated that he did not have any decisionmaking authority to authorize Schluter's return; his role was limited to making recommendations to the Mayor's office.  Harris Dep. at 40, 42-43.  Harris testified that the City Council had the ultimate authority to authorize Schluter's return.  Id. at 40.

Additional circumstantial evidence calls into question whether the stated reasons were the actual reasons for the different treatment of Plaintiffs.  The fact that the Schluter Ordinance was not a general policy change, but applicable solely to Schluter and no one else, raises an inference that race was a motivating factor in restoring Schluter's prior service credit, but denying the same benefit to the Plaintiffs.  The wording of the

---

[14]It is important to note that the issue in this case is not why the Plaintiffs, unlike Schluter, were required to go through the usual hiring process in order to be rehired by the City, but why the Plaintiffs, unlike Schluter, were not given their prior service credit once they renewed their requests for such credit in December 2002.

Ordinance also raises a question as to whether the Schluter Ordinance constituted a change in City policy or an exception to the policy for one person based on race. Alderman McNeil testified that the City Council was concerned about the low number of minority police officers on the Police Department and wanted to remedy this issue by returning qualified minority police officers like Schluter to the police force. This evidence also raises an inference that race was a motivating factor in restoring Schluter his prior service credit, but denying the same benefit to the Plaintiffs.

The ninth stated reason--the operational need for diversity--could be used to justify re-hiring Schluter in the manner he was hired, but it does not justify failing to award Plaintiffs their prior service credit too.[15]

Preferences designed to promote diversity are subject to strict scrutiny. "It is by now well established that 'all racial classifications

---

[15]Plaintiffs erroneously argue that the City's diversity justification should have been raised as an affirmative defense under Fed. R. Civ. P. 8(c). Plaintiffs are mistaken. "Affirmative defense" is "[a] defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's or prosecutions's claim, even if all allegations in the complaint are true." Black's Law Dictionary 430 (Bryan A. Garner ed., 7th ed. 1999). The non-discriminatory reason proffered by defendants in Title VII employment discrimination cases does not perform that function. Rather, it is part of this analytical construct established by the Supreme Court in McDonnell Douglas Corp. to analyze employment discrimination cases. This analytical framework allows a defendant to come forward with a legitimate, non-discriminatory reason for the employment action at issue once the plaintiff establishes his or her prima facie case, without having to raise such a defense as an affirmative defense. This analytical framework does not perform the same function performed by an affirmative defense.

reviewable under the Equal Protection Clause must be strictly scrutinized.'" Gratz v. Bollinger, 539 U.S. 244, 270 (2003) (quoting Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 224 (1995)).[16]  As such, the evidence must show that the operational need for diversity was justified by a compelling state interest and that the means chosen (here, the Schluter Ordinance) was narrowly tailored to accomplish the City's asserted purpose of promoting diversity in the Springfield Police Department.  Id.; Grutter v. Bollinger, 539 U.S. 306, 339 (2003) ("Narrow tailoring does, however, require serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks."); Petit v. City of Chicago, 352 F.3d 1111, 1114 (7th Cir. 2003) (citing Adarand, 515 U.S. at 227).

The need for diversity in police departments can be a compelling interest.  The Seventh Circuit has stated in Petit that there is a compelling

---

[16]The Court has not found any Seventh Circuit cases addressing whether strict scrutiny (used to review racial classifications under the Equal Protection Clause) should be applied in Title VII disparate treatment cases.  The parties do not argue that a different standard should be applied.  As such, the Court believes that the strict scrutiny standard is an appropriate standard applicable to Title VII disparate treatment cases as well.  The Court further notes that the Defendant does not argue that it was interested in promoting diversity pursuant to an affirmative action plan.  Had that been the case, the Court would employ the analytical framework set forth in Johnson v. Transportation Agency, Santa Clara County, California, et al., to determine whether the affirmative action plan is valid.  Johnson, 480 U.S. 616, 626-627 (1987).

state need for diversity in a police department, especially "in a   large metropolitan police force charged with protecting a racially and ethnically divided major American city like Chicago."  Petit, 352 F.3d at 1114.  In so holding, the Seventh Circuit relied on Grutter in which the Supreme Court found that "student body diversity is a compelling state interest that can justify the use of race in university admissions."  Grutter, 539 U.S. at 325.  Plaintiffs also concede that having diversity is in the public interest.  In light of the Seventh Circuit's decision in Petit, the testimonies of Alderman McNeil and Chief Harris, and the Plaintiffs' concession, the Court finds that there is a compelling state need for diversity in the Springfield Police Department.

The City, however, has failed to present evidence showing that the enactment of the Schluter Ordinance was narrowly tailored to accomplish the City's stated purpose of promoting diversity in the Police Department and that racially neutral alternatives were unworkable.  In Gratz, the Supreme Court held that the University of Michigan's admission system giving preferential treatment on account of race, by automatically giving 20 points to under-represented minority students, was not narrowly tailored and, thus, violated the Equal Protection Clause.  Gratz, 539 U.S. at 270.

43

Here, the Schluter Ordinance, assuming it applies only to Schluter, automatically gave preferential treatment to Schluter apparently primarily because of his race; the Ordinance was not narrowly tailored to promote diversity because the same diversity could have been accomplished by crediting Plaintiffs past service credit as well.

In a decision handed down the same day as <u>Gratz</u>, the Supreme Court in <u>Grutter</u> upheld the University of Michigan Law School's admission policy finding that the admission policy in question gave meaningful individualized consideration of applicants, without making an applicant's race a decisive factor in ensuring his or her admission to the Law School. Here, there is at least a question of fact as to whether race was the decisive factor in the treatment of the Plaintiffs and Schluter.  There are also questions of fact for trial as to whether the Schluter Ordinance constituted a change in City policy which will apply prospectively to other officers of all races in the future, but not the Plaintiffs, and whether the difference in time the Plaintiffs were off the police force, as opposed to Schluter, warrant different treatment.  These issues, however, are for the trier of fact to resolve at trial.

B.      SECTION 1983 EQUAL PROTECTION CLAIM

(COUNTS II, IV and VI)

Section 1983, generally imposes liability on the individual who violated the plaintiff's rights.  <u>Monell v. Department of Social Services of City of New York</u>, 436 U.S. 658, 694 (1978).  The Plaintiffs brought the action against the City of Springfield.  Each Plaintiff in his § 1983 claim against the City must show that the practice of racial discrimination against him was due to a policy, practice or custom of the City that had the force of law.  <u>Killinger v. Johnson</u>, 389 F.3d 765, 771 (7th Cir. 2002); <u>Gable v. City of Chicago</u>, 296 F.3d 531, 537 (7th Cir. 2002).  Plaintiffs undisputably are relying on the City's adoption of the Schluter Ordinance without giving them the same benefit of it.  The other elements used to prove a § 1983 Equal Protection claim are the same as those used to prove a <u>prima</u> <u>facie</u> case for disparate treatment claims under Title VII.  <u>See</u> <u>e.g.</u>, <u>Goodwin v. Board of Trustees of University of Illinois</u>, 442 F.3d 611, 617-18 (7th Cir. 2006); <u>McNabola v. Chicago Transit Authority</u>, 10 F.3d 501, 513 (7th Cir. 1993); <u>Riordan v. Kempiners</u>, 831 F.2d 690, 696-97 (7th Cir. 1987).  For the aforementioned reasons, summary judgment must therefore be denied on the Section 1983 Equal Protection claims (Counts II, IV and VI), accruing after November 10, 2003, for Plaintiffs Groesch and Allin and after

January 19, 2005, for Plaintiff Shaffer.

THEREFORE, as set forth above, Defendant's Motion for Summary Judgment (d/e 19) is ALLOWED in part and DENIED in part.  Defendant is entitled to summary judgment on Plaintiffs' claims for damages arising prior to the state trial court judgment on November 10, 2003.  Defendant is further entitled to summary judgment on Plaintiff Shaffer's claims for monetary damages accruing prior to January 19, 2005.  Summary judgment is DENIED in all other respects.  The parties are directed to file any Motions in Limine by January 19, 2007.  The pretrial conference remains scheduled for February 26, 2007, at 9:00 a.m.

IT IS THEREFORE SO ORDERED.

ENTER: December 29, 2006.

FOR THE COURT:

_____ s/  Jeanne E. Scott _____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE